**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JERRY W. CARROLL # 113415,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:13-00152** |
| | ) | **Judge Sharp/Brown** |
| **DR. PELMORE, ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**To: The Honorable Kevin H. Sharp, United States District Judge**.

## REPORT AND RECOMMENDATION

For the reasons stated below, the Magistrate Judge **RECOMMENDS**: 1) that defendants' motion for summary judgment (Doc. 114) be **GRANTED**; 2) that this action be **DISMISSED WITH PREJUDICE** for failure to state a claim on which relief may be granted under 28 U.S.C. § 1915(e)(2)(B)(ii); 3) that acceptance and adoption of this Report and Recommendation (R&R) constitute the **FINAL JUDGMENT** in this action; and 4) that any appeal **NOT** be certified as taken in good faith pursuant to 28 U.S.C. § 1915(a)(3).

## I. STATEMENT OF
## THE CASE

Plaintiff, proceeding *pro se* and *in forma pauperis*, brought this action under 42 U.S.C. § 1983 alleging violations of his rights under the Eighth Amendment. (Doc. 1, p. 4)[1] Plaintiff was incarcerated in the Metro-Davidson County (Metro) Detention Facility (MDCDF) in Nashville at the time of the alleged events that gave rise to this action. (Doc. 1, ¶ II.A, p. 2) MDCDF is operated by Corrections Corporation of America (CCA).

Plaintiff named the following defendants to this action: Dr. Janet Pelmore, M.D., former

---

[1] Plaintiff did not number the pages consecutively in his 98-page complaint. The page numbers in the <u>complaint</u> to which reference is made are the page numbers assigned by the court's CM/ECF system.

physician at MDCDF (Dr. Pelmore); Tanya Taylor, RN, Health Services Administrator at MDCDF (Nurse Taylor); Connie Blanton, Health Administrator at MDCDF (Ms. Blanton);[2] Warden Blair Lelibach (Warden Lelibach);[3] Dr. Daniel Cherry, D.O., CCA Regional Medical Director (Dr. Cherry); and CCA. (Doc. 1, pp. 4-5) The complaint sues the defendants in both their individual and official capacities. (Doc. 1, p. 13) Plaintiff seeks injunctive relief, compensatory and punitive damages. (Doc. 1, p. 13)

This case was referred to the Magistrate Judge on March 1, 2013 "for management of the case, for decisions on all pre-trial, non-dispositive motions, to issue a[n] [R&R] on all dispositive motions, and to conduct further proceedings, as necessary, in accordance with Rule 72(b) of the Federal Rules of Civil Procedure, and the Local Rules of Court." (Doc. 8, pp. 3-4) The Magistrate Judge was further authorized to "recommend the dismissal of any claim for the reasons set forth in 28 U.S.C. § 1915(e)(2)." (Doc. 8, p. 4)

Plaintiff moved to amend the facts in the original complaint on May 23, 2013. (Doc. 45) Plaintiff's motion was granted on June 5, 2013 "to the extent" that he was permitted to "add the requested paragraphs 47 through 59 to the [original] complaint." (Docs. 68, 80) A case management order was entered on June 13, 2013, and the case set for trail on September 16, 2014. (Doc. 82)

Drs. Pelmore and Cherry, Nurse Taylor, and CCA moved for summary judgment on August 30, 2013. (Doc. 114) Defendants filed a memorandum of law in support of their motion for summary judgment, a consolidated statement of undisputed material facts, and individual affidavits. (Docs. 115-122)

---

[2] The complaint was dismissed against Ms. Blanton on February 7, 2014 for failure to effect service of process. (Docs. 105, 136, 160)

[3] The complaint was dismissed against Warden Lelibach on initial review. (Doc. 8, ¶ B, p. 2)

The Magistrate Judge noted in an order entered on November 26, 2013 that "Plaintiff complains . . . he has not been receiving a prescribed medication – Gabatentin (300 mg) and that no substitute was provided."  (Doc. 136, p. 1)  The Magistrate Judge ordered counsel for CCA to "advise the Court whether the pain medication situation ha[d] been resolved."  (Doc. 136, p. 1)  CCA noticed the court on November 4, 2013 that it had been.  (Doc. 145)  Plaintiff replied on December 23, 2013, alleging that CCA had made a "false statement under false pre[]tenses,"[4] but did not dispute that Gabatentin was available to him.  (Doc. 151)

Plaintiff responded to defendants' motion for summary judgment on December 2, 2013 in the form of a motion in opposition to defendants' motion for summary judgment ("motion in opposition"), a memorandum of law in opposition to the motion for summary judgment ("memorandum in opposition"), his personal declaration, his own statement of undisputed material facts, and his "reply" to defendants' statement of undisputed material facts.  (Docs. 140-44) Defendants replied on December 16, 2013 to plaintiff's motion in opposition and "reply" to their statement of undisputed material facts.  (Docs. 146-49)  Plaintiff filed a surreply on January 31, 2014.  (Doc. 157)  This matter is now properly before the court.

## II. FACTUAL ALLEGATIONS

Plaintiff asserts that he was diagnosed with hepatitis C in 1985, and that Dr. Vladimir Berthaud, whom plaintiff describes as an "infectious disease expert" at the Meharry Hospital in Nashville (Meharry), prescribed interferon treatment for him "on or about" February 27, 2012. (Doc. 1, ¶¶ (1)-(2), p. 6)  According to plaintiff, he saw Dr. Berthaud "every month" until plaintiff was arrested "on or about" February 26, 2012 for parole violation."  (Doc. 1, ¶¶ (3)-(4), p. 6)

---

[4] Plaintiff drafted every document he filed in all capitals.  Incorrect/unnecessary capitalization has been omitted from those parts of the documents quoted herein for ease of reading.

Plaintiff was incarcerated in MDCDF "on or about" March 24, 2012. (Doc. 1, ¶ (5), p. 6)

Plaintiff alleges that Dr. Pelmore evaluated him "on or about" April 4, 2012, that he told her he had hepatitis C, and that he made it known that Dr. Berthaud had ordered him to begin interferon treatments. (Doc. 1, ¶ (7), p. 6) Plaintiff alleges that he also informed Dr. Pelmore that Dr. Berthaud had prescribed medication for pain caused by his hepatitis C, and that he informed all of the "medical defendants" where he had the prescription for his pain medication filled. (Doc. 1, ¶ (7), p. 6) According to plaintiff, Dr. Pelmore "immediately ordered lab work . . . includ[ing] a . . . complete blood count and a hepatitis C viral load [to determine] how much hepatitis C virus [wa]s in the liver." (Doc. 1, ¶ (9), p. 6)

Plaintiff alleges that he requested "numerous times" to be given medication for his pain and to be seen by "a doctor qualified in the treatment of hepatitis C . . . ." (Doc. 1, ¶ 11, p. 7) According to plaintiff, Dr. Pelmore refused to "submit a medical referral," told him that "he was not going to get anything for the pain," and that he was not "going to get [the] prescribed pain medication [he] was on before his incarceration . . . ." (Doc. 1, ¶¶ (11)-(12), p. 7) Plaintiff alleges that Dr. Pelmore told him to "'suck it up . . . [and] endure the pain like a real man.'" (Doc. 1, ¶ 14, p. 7)

Plaintiff avers that he filed a grievance based on the foregoing in addition to "eight other informals/grievances" that he had filed previously on "these issues." (Doc. 1, ¶¶ (15)-(16), p. 7) Plaintiff avers that his "informal" was answered by Ms. Blanton who provided plaintiff with "verbal teaching on [the] function of [the] liver . . . [and] . . . pain medication," but denied plaintiff's grievance, and "refused to prevent [him] from being . . . mistreated by . . . Dr. Pelmore." (Doc. 1, ¶ (17), p. 8)

Plaintiff alleges that he appealed Ms. Blanton's decision to Nurse Taylor, who told him that he "could not take ibuprofen or Tylenol," and "that [although] other pain medications were

available, . . . [they were] not on the CCA pharmacy list," so he "would have to do the best he could with the pain."  (Doc. 1, ¶ (18), p. 8)

Plaintiff states that he then appealed his grievance to Warden Lelibach, but she responded that "'appropriate medical treatment is being administered according to [the] . . . Health Services Administrator . . . and qualified medical practitioners."  (Doc. 1, ¶ 19, p. 8)

Plaintiff alleges that later "lab results showed [his] hepatitis C virus . . . had nearly doubled in less than six months," but that even "after becoming aware of [his] lab results in October . . . 2012, Dr. Pelmore still refused plaintiff any medical treatment . . . includ[ing] . . . pain medication, . . . medical referral to an outside specialist . . . [and] interferon treatment . . . ."  (Doc. 1, ¶ 22, p. 5)

Plaintiff asserts that he was "evaluated" by Angelina Baker, NP, "on or about" November 4, 2012, and that Nurse Baker submitted an "emergency referral" to Dr. Cherry for plaintiff to see a liver specialist.  (Doc. 1, ¶¶ (23)-(25), pp. 8-9)  Plaintiff avers that Nurse Baker "immediately ordered Naproxen for [his] pain" which, according to plaintiff, was the first pain medication he had received in six months.  (Doc. 1, ¶¶ (26)-(27), p. 9)  Plaintiff asserts that he was informed by the sick-call nurse "on or about" December 10, 2012 that Dr. Cherry had denied his medical referral.  (Doc. 1, ¶ (29), p. 9)

Plaintiff avers that he filed a grievance against Dr. Cherry "on or about" December 17, 2012, and that Nurse Taylor responded to the grievance "stat[ing] . . . that Dr. Cherry still [had] not determined . . . whether he was going to approve the . . . referral . . . ."  (Doc. 1, ¶ (31), p. 10)  Plaintiff maintains that he then appealed his grievance to Warden Lelibach.  (Doc. 1, ¶ 32, p. 10)[5]

In his amended complaint, plaintiff asserts that he was evaluated "on or about" March 6,

_____

[5]  The remainder of the original complaint, *i.e.*, ¶¶ (34)-(42), pp. 10-11, pertains to two grievances that plaintiff filed in August 2012, not to any factual allegations pertaining to his Eighth Amendment claim.

2013 by Dr. James Bridges, M.D., "the . . . doctor that CCA hired to take the place of Dr. Pelmore."[6] (Doc. 45, ¶ 47), p. 2)  According to plaintiff, Dr. Bridges increased plaintiff's Naproxen prescription from 250 mg to 500 mg, then later changed the Naproxen to Tramadol 50 mg twice daily, and later still he changed the Tramadol prescription to Aceta Gesic.  (Doc. 45, ¶¶ (48)-(50), p. 3)

Plaintiff alleges that he filed a grievance when he learned that Aceta Gesic contained acetaminophen which could damage his liver.  (Doc. 45, ¶¶ (51)-(52), pp. 2-3)  Plaintiff alleges further that Nurse Taylor told him "he could take the medication . . . or refuse it, that it was up to [him]."  (Doc. 45, ¶ 52, p. 3)  Plaintiff avers that he appealed the response to this grievance to the Warden, but the Warden did not respond "within the CCA grievance procedure time frame."  (Doc. 45, ¶¶ (54)-(55), p. 3)[7]

## III.  ANALYSIS

### A.  Actions Under § 1983

To state a claim under § 1983, plaintiff must allege and show: 1) that he was deprived of a right secured by the Constitution or laws of the United States; and 2) that the deprivation was caused by a person acting under color of state law.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)(overruled in part by *Daniels v. Williams*, 474 U.S. 327, 330 (1986)); *Santiago v. Ringle*, 734 F.3d 585, 589 (6th Cir. 2013).  "Absent either element, a section 1983 claim will not lie."  *See Christy v. Randlett*, 932 F.2d 502, 504 (6th Cir. 1991).  A successful § 1983 claimant must establish that the defendant acted knowingly or intentionally to violate his constitutional rights.  *Daniels*, 474 U.S. at 333-36; *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013); *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir.

---

[6]  The statement of facts in plaintiff's amended complaint all pertain to the period of time after he filed his complaint.  Consequently, those factual allegations do not pertain to the cause of action before the court.

[7]  The remainder of plaintiff's amended complaint pertains to medical records from Meharry intended to establish that Dr. Berthaud had prescribed interferon treatment.  (Doc. 45, ¶¶ (56)-(59), pp. 3-4)

1999)(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)).

## B. Summary Judgment

Summary Judgment is appropriate only where "there is no genuine issue as to any material fact . . . and the moving party is entitled to summary judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Newman v. Federal Express Corp.*, 266 F.3d 401, 404-05 (6ᵗʰ Cir. 2001). A "genuine issue of material fact" is a fact which, if proven at trial, could lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the burden of showing the absence of genuine factual disputes from which a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 249-50. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)(quoting *First Nat. Bank of Arizona v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In considering whether summary judgment is appropriate, the court must "look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial." *Sowards v. Loudon County*, 203 F.3d 426, 431 (6ᵗʰ Cir. 2000), *cert. denied*, 531 U.S. 875 (2000). If there is a genuine issue of material fact," then summary judgment should be denied. *Sowards*, 203 F.3d at 431. However, "[t]he moving party need not support its motion with evidence disproving the non-moving party's claim, but need only show that 'there is an absence of evidence to support the non-moving party's case.'" *Hayes v. Equitable Energy Resources Co.*, 266 F.3d 560, 566 (6ᵗʰ Cir. 2001)(quoting *Celotex Corp.*, 477 U.S. at 325). "A 'mere scintilla' of evidence, however, is not enough for the non-moving party to withstand summary judgment." *U.S. ex. Rel. Wall v. Circle C Const., L.L.C.*, 697 F.3d 345, 351 (6ᵗʰ Cir. 2012)(quoting *La Quinta Corp. v. Heartland Prop.*, LLC,

603 F.3d 327, 335 (6th Cir. 2010)(citing *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006)).

Moreover, plaintiff "must do more than rely . . . on the allegations of [his] pleadings . . . [he] is

obliged to come forward with 'specific facts,' based on 'discovery and disclosure materials on file,

and any affidavits,' showing that there is a genuine issue for trial. *Chalppell v. City of Cleveland*,

585 F.3d 901, 912 (6th Cir. 2009)(citing Rule 56(c), Fed. R. Civ. P.; *Matsushita Elec. Indus. Co.*, 475

U.S. at 586-87.

.

## C. Plaintiff's Eighth Amendment Claim

"[A] prisoner's Eighth Amendment right is violated when prison doctors or officials are

deliberately indifferent to the prisoner's serious medical needs." *Quigley v. Tuong Vinh Thai*, 707

F.3d 675, 681 (6th Cir. 2013)(quoting *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir.2001)(citing

*Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). An Eighth Amendment claim for the denial of medical

care has an objective and subjective component. *Quigley,* 707 F.3d at 681 (citing *Comstock*, 273

F.3d at 702). The objective component requires that the alleged deprivation be sufficiently severe,

while the subjective component requires that the defendant(s) acted with a sufficiently culpable state

of mind. *Quigley,* 707 F.3d at 681.

Notwithstanding the foregoing, complaints of malpractice or allegations of negligence are

insufficient to entitle plaintiff to relief under § 1983. *Estelle*, 429 U.S. at 105-06. A prisoner's

difference of opinion regarding treatment also does not rise to the level of an Eighth Amendment

violation. *Estelle*, 429 U.S. at 107. Finally, where a prisoner has received some medical attention,

but disputes the adequacy of that treatment, the federal courts are reluctant to second-guess prison

officials' medical judgments and constitutionalize claims which sound in state tort law. *Graham*

*ex rel Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004)(citing *Westlake*

*v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)).

**D. Analysis**

Defendants make the following arguments in their memorandum in support of their motion for summary judgment: 1) CCA is not liable under § 1983 on a *respondeat superior* theory; 2) plaintiff cannot establish that defendants were deliberately indifferent to his serious medical needs; 3) plaintiff's alleged physical injuries are *de minimis*. (Doc. 115) As shown below, defendants' second argument is dispositive. Therefore, there is no need to address their *respondeat superior* and *de minimis* injury arguments.

The crux of defendants' deliberate indifference argument is that plaintiff received appropriate medical care, and that he merely disagrees with the treatment he received. (Doc. 115, ¶ III.B, pp. 15-20) Defendants support their motion for summary judgment with numerous affidavits, those of Drs. Pelmore and Bridges being particularly relevant.[8] (Docs. 117-18, 121, 148) The following summarizes those portions of the affidavits of Drs. Pelmore and Bridges that are relevant to defendants' deliberate indifference argument:

1.    Dr. Pelmore represents that plaintiff was assigned to the Chronic Care Clinic at MDCDF upon his incarceration to ensure that he received medical evaluation and treatment for his hepatitis C and HIV "at specified intervals during his incarceration." (Doc. 121, ¶ 3, pp. 1-2) Dr. Bridges' first affidavit supports Dr. Pelmore's representation. (Doc. 117, ¶ 3, pp. 1-2)

2.    Dr. Pelmore represents that plaintiff presented at the Chronic Care Clinic on March 26, 2012, four days after his incarceration. (Doc. 121, ¶ 4, p. 2) Dr. Bridges' first affidavit supports Dr. Pelmore's representation. (Doc. 117, ¶ 4, p. 2)

3.    Dr. Pelmore represents that she examined plaintiff on March 26, 2012,[9] and that she ordered laboratory testing "specifically related to

---

[8] Both doctors base their affidavits on MDCDF medical records as well as their personal knowledge, education, training and experience.

[9] As previously noted at p. 4, plaintiff began his term of incarceration in MDCDF on or about March 24, 2012.

his hepatitis C and HIV."  (Doc. 121, ¶ 4, p. 2)  Dr. Bridges' first affidavit supports Dr. Pelmore's representation.  (Doc. 117, ¶ 4, p. 2)

4. Dr. Pelmore represents that she met with plaintiff again on May 1, 2012, that she performed another medical evaluation, that she reviewed the previous laboratory results with him that showed his hepatitis C remained stable but his HIV had improved, that she instructed plaintiff to continue his current care plan, and that she ordered additional laboratory testing.  (Doc. 121, ¶ 4, p. 2)  Dr. Bridges' first affidavit supports Dr. Pelmore's representation.  (Doc. 117, ¶ 4, p. 2)

5. Dr. Pelmore represents that she met with plaintiff again on June 6, 2012, at which time she reviewed the most recent laboratory data with him, and informed plaintiff that his hepatitis C and HIV remained stable.  (Doc. 121, ¶ 5, p. 2)  Dr. Bridges' first affidavit supports Dr. Pelmore's representation.  (Doc. 117, ¶ 5, p. 2)

6. Dr. Pelmore represents that, at the June 6, 2012 meeting, plaintiff requested he be referred to an infectious disease specialist and prescribed interferon treatments.  (Doc. 121, ¶ 5, p. 2)  Dr. Pelmore represents that she declined to refer plaintiff to an infectious disease specialist because his condition was stable, or to prescribe interferon treatment, because he had "failed this medical therapy" in 2008 and 2009.  (Doc. 121, ¶ 5, p. 2)  Dr. Bridges's first affidavit supports Dr. Pelmore's representation.  (Doc. 117, ¶ 5, p. 2)

7. Dr. Pelmore represents that, at the June 6, 2012 meeting, plaintiff "complained of abdominal pain . . .  from his hepatitis C, and requested an extended prescription of ibuprofen.  (Doc. 121, ¶ 5, p. 2)  Dr. Pelmore represents that she "refused to provide [plaintiff] an extended prescription of ibuprofen and instructed [plaintiff] to present to sick call for ibuprofen on an as needed basis," and that her decision was "medically appropriate" because "it can be harmful for any patient to take such medication regularly for an extended period of time."  (Doc. 121, ¶ 5, p. 2)  Dr. Bridges's first affidavit supports Dr. Pelmore's representation.  (Doc. 117, ¶ 5, p. 3)

8. Dr. Pelmore represents that MDCDF "medical personnel continued to evaluate [plaintiff]" in "the ensuing months" with respect to his hepatitis C and HIV.  (Doc. 121, ¶ 6, p. 3)  Dr. Bridges's first affidavit supports Dr. Pelmore's representation.  (Doc. 117, ¶ 6, p. 3)

9. Dr. Pelmore represents that she ordered an ultrasound of plaintiff's

liver on July 20, 2012 when plaintiff complained of abdominal pain. (Doc. 121, ¶ 6, p. 3)  Dr. Pelmore represents that the ultrasound revealed "fatty infiltration of the liver" but "no other abnormalities." (Doc. 121, ¶ 6, p. 3)  Dr. Pelmore further represents that no further medical treatment was ordered because "[f]atty infiltration of the liver is not caused by hepatitis C and cannot be managed with interferon treatments."  (Doc. 121, ¶ 6, p. 3)  Dr. Bridges's first affidavit supports Dr. Pelmore's representation.  (Doc. 117, ¶ 6, p. 3)

10.    Dr. Pelmore represents that she evaluated plaintiff on October 16, 2012, determined that he was doing well, and ordered additional laboratory testing. (Doc. 121, ¶ 7, p. 3)  Dr. Bridges's first affidavit supports Dr. Pelmore's representation.  (Doc. 117, ¶ 7, p. 3)

11.    Dr. Pelmore represents that Nurse Baker evaluated plaintiff on November 9, 2012 when plaintiff complained of neck and shoulder pain. (Doc. 121, ¶ 7, p. 3)  Dr. Pelmore further represents that Nurse Baker reviewed plaintiff's previous laboratory results at that time which showed that his "hepatitis C viral load count increased from 17,082,516 in March 2012 to 33,383,040 in October 2012."  (Doc. 121, ¶ 7, p. 3)  Dr. Bridges's first affidavit supports Dr. Pelmore's representation.  (Doc. 117, ¶ 7, p. 3)

12.    Dr. Pelmore represents "the increase in [plaintiff's] hepatitis C viral load count did not suggest a worsening of his liver condition or mandate different or advanced treatment of his hepatitis C . . . [because] . . . the hepatitis C viral load count . . . measures blood levels, not what is actually taking place in the liver cells." (Doc. 121, ¶ 7, p. 3)  Dr. Bridges's first affidavit supports Dr. Pelmore's representation.  (Doc. 117, ¶ 7, p. 3)

13.    Dr. Pelmore represents that plaintiff requested a referral to an infectious disease specialist and interferon treatments during his November 9, 2012 meeting with Nurse Baker, and that Nurse Baker requested an infectious disease consultation.  (Doc. 121, ¶ 8, p. 4)  Dr. Pelmore represents that the consultation was determined to be unnecessary because: a) CCA had a physician on staff competent to treat plaintiff's hepatitis C; b) plaintiff's hepatitis C had remained "appropriately stable" during the period of his incarceration; c) plaintiff previously "failed medical intervention through interferon treatments, and there [was] no certainty . . . that [he] would experience a different result"; d) interferon treatments previously caused plaintiff to "suffer mental distress and serious suicidal ideations."  (Doc. 121, ¶ 8, p. 4)  Dr. Bridges's first affidavit

supports Dr. Pelmore's representation.  (Doc. 117, ¶ 8, pp. 4-5)

14.     Dr. Pelmore represents that Nurse Baker prescribed Naproxen for plaintiff on November 9, 2012 for his neck and shoulder pain.  (Doc. 121, ¶ 8, p. 4)  Dr. Bridges's first affidavit supports Dr. Pelmore's representation.  (Doc. 117, ¶ 8, p. 4)

15.     Dr. Bridges represents in his first affidavit that plaintiff was prescribed Naproxen on three occasions, none of which was related to his hepatitis C.  (Doc. 117, ¶ 9, p. 4)  Dr. Bridges amended this statement in his second affidavit as follows: "Upon further examination, it appears that [plaintiff] was more regular in either taking Naproxen tablets or in accepting a thirty-day blister pack of Naproxen that was designated as 'keep on person.'" (Doc. 118, ¶ 3, p. 1)

16.     Dr. Bridges represents in his first affidavit that plaintiff presented to the Chronic Care Clinic on February 13, 2013, at which time James Heinrich, LPN, evaluated him, determined that he was doing well, and ordered laboratory testing.  (Doc. 117, ¶ 10, p. 4)

17.     Dr. Bridges represents in his first affidavit that he met with plaintiff on March 7, 2013 to review the recent laboratory data that showed that the viral load count had decreased from 33,383,040 in October 2012 to 21,560,784 in February 2013.  (Doc. 117, ¶ 11, pp. 4-5)  Although plaintiff asked to be referred to an infectious disease, Dr. Bridges "[u]ltimately . . . determined that referral was medically unwarranted."  (Doc. 117, ¶ 11, p. 5)

18.     Dr. Bridges represents in his first affidavit that, since plaintiff's incarceration in March 2012, plaintiff has "submitted sick call requests and . . . presented to medical personnel on more than twenty-five occasions . . . [for] dental and mental health treatment and treatment of various ailments . . . ."  (Doc. 117, ¶ 13, p. 5)

19.     Dr. Bridges represents in his first affidavit that "[b]ased on [his] review of [plaintiff's] medical records and [his] personal knowledge, education, training, and experience . . . the medical treatment provided to [plaintiff] during his incarceration . . . was entirely appropriate . . . ."  (Doc. 117, ¶ 14, p. 5)

20.     In his second affidavit, Dr. Bridges provided the following tabular data to show that plaintiff's condition improved during the course of his incarceration.

| Date | AST Value | ALT Value |
|---|---|---|
| March 26, 2012 | 50 | 77 |
| October 19, 2012 | 47 | 56 |
| February 15, 2013 | 47 | 51 |
| May 21, 2013 | 39 | 48 |

(Doc. 118, ¶ 8, p. 3)

21.    Dr. Bridges represents in his second affidavit that he determined again on June 6, 2013 and June 25, 2013 that referral to an infectious disease specialist and interferon treatments were unwarranted. (Doc. 118, ¶¶ 8-9, pp. 3-4)

22.    Dr. Bridges represents in his third affidavit that Dr. Pelmore wrote plaintiff two prescriptions for ibuprofen for a "five-day period – once on May 22, 2012 and again on September 20, 2012." (Doc. 148, ¶ 3, p. 1)

23.    Dr. Bridges represents in his third affidavit that plaintiff's liver condition continued to improve. (Doc. 148, ¶ 4, p. 2) Dr. Bridges provided the following tabular data in support of his statement.

| Date | AST Value | ALT Value |
|---|---|---|
| March 26, 2012 | 50 | 77 |
| October 19, 2012 | 47 | 56 |
| February 15, 2013 | 47 | 51 |
| May 21, 2013 | 39 | 48 |
| August 27, 2013 | 39 | 40 |

(Doc. 148, ¶ 8, p. 2)

The affidavits of Drs. Pelmore and Bridges summarized above support plaintiff's complaint that he was not referred to an infectious disease specialist, that he was not prescribed interferon, and that he was not given standing prescriptions for pain medication. On the other hand, the affidavits of Drs. Pelmore and Bridges establish that plaintiff received medical treatment for his condition. Plaintiff was assigned to the Chronic Care Clinic at MDCDF, he was examined on a recurring basis,

laboratory testing was ordered on numerous occasions, the results of those laboratory tests were routinely reviewed with plaintiff, an ultrasound of plaintiff's liver was ordered at one point during his incarceration in response to his complaint of pain, and his condition remained stable or improved during his incarceration. The next question is what arguments/evidence does plaintiff raise in his response in opposition to defendants' motion for summary that would establish a genuine need for trial.

Plaintiff's motion in opposition, *i.e.*, his "response," merely "summarizes the arguments offered by the defendants in their motion for summary judgment." (Doc. 140, p. 2) It does not provide evidence, law or argument in support of his opposition. Nor does it refute in any way the representations of Drs. Pelmore and Bridges summarized above with respect to the medical care that he was provided at MDCDF.

The first 5-plus pages of plaintiffs memorandum in opposition recaps the facts alleged in the original and amended complaints. (Doc 141, pp. 1-6) The remaining 18 pages provide law and argument as to why plaintiff believes that the alleged events that gave rise to this action entitle him to relief. (Doc. 141, pp. 6-24) However, his memorandum in opposition does not provide any evidence in support of his opposition. Nor does it refute in any way the representations of Drs. Pelmore and Bridges summarized above with respect to the medical care that he was provided at MDCDF.

Plaintiff filed a personal declaration in support of his opposition to the motion for summary judgement. (Doc. 142) Plaintiff's personal declaration again recaps the alleged facts in this case. However, plaintiff's declaration offers no evidence or anything new. Neither does plaintiff say anything in his declaration that refutes in any way the declarations of Drs. Pelmore and Bridges summarized above with respect to the medical care that he was provided at MDCDF.

In his "reply" to defendants' statement of undisputed material facts, plaintiff disputes several statements made by defendants. (Doc. 143, ¶¶ (13)-(15), (17)-(20), pp. 3-7) Those disputed statements – enumerated below – comprise plaintiff's only real attempt to challenge defendants' motion for summary judgment.

1. **Paragraph 13** of defendants' statement of undisputed material facts reads in relevant part: "Dr. Pelmore saw [plaintiff] for his hepatitis C and human immunodeficiency virus . . . on March 26, 2012, June 6, 2012, and October 165, 2012 . . . [and] . . . during each of these visits, Dr. Pelmore evaluated [plaintiff] and ordered laboratory testing." (Doc. 116, ¶ 13, p. 4)

   Plaintiff disputes the statement above. (Doc. 143, pp. 3-4) Plaintiff refers to ¶¶ 6-8, 10-16 in his original complaint. (Doc. 1, pp. 6-7) These paragraphs are not relevant to the statement above. The Magistrate Judge notes, however, that plaintiff omitted reference to ¶ (9) in the original complaint (Doc. 1, pp. 6-7), which reads in relevant part that Dr. Pelmore "immediately ordered lab work . . . that . . . . include[d] . . . complete blood work . . . and . . . hepatis C viral load . . . [that shows] how much hepatitis C virus is in the liver," not only supports the statement above, it is consistent the declarations of Drs. Pelmore and Bridges.

   Plaintiff's refers to Ex. A filed with his original complaint. (Doc. 1, p. 14) Exhibit A is not relevant to the statement above. On the other hand, Ex. A does support the declarations of Drs. Pelmore and Bridges that Dr. Pelmore ordered an ultrasound of plaintiff's liver when he complained of pain.

   Plaintiff refers to Dr. Pelmore's response to ¶ 1 of plaintiff's first set of interrogatories. (Doc. 141-1, pp. 63-64) Dr. Pelmore's response in ¶ 1 is not relevant to the statement above.

   Plaintiff's makes blanket reference to his 109-page memorandum in opposition. (Doc. 141) Plaintiff's memorandum in opposition actually is consistent with the statement above in that it establishes plaintiff first saw Dr. Pelmore in March 2012 and that laboratory testing was ordered on his behalf more than once.

   Plaintiff refers to Ex. H1-H5 attached to his memorandum in opposition. (Doc. 141-1, pp. 31-35) Exhibits H1 and H2 are

Meharry medical records and are not relevant to the statement above. Exhibits H4 and H5 are MDCDF treatment records for the period after the events that gave rise to this action are alleged to have occurred. As such, they too are not relevant to the statement above. Exhibit H3 actually supports the statement above in that it shows the laboratory testing in March did, in fact, occur.

2.  **Paragraph 14** of defendants' statement of undisputed material facts reads, in relevant part: "During [plaintiff's] March 26, 2012 and June 6, 2012 presentations to Dr. Pelmore, [plaintiff] requested that Dr. Pelmore refer him to an infectious disease specialist and prescribe interferon treatments to him. On each of those occasions, Dr. Pelmore properly determined that [Plaintiff] did not require a referral or prescribe interferon treatments . . . ." (Doc. 116, ¶ 14, p. 4)

    Plaintiff disputes the statement above. (Doc. 143, pp. 4-5) Plaintiff again refers to ¶¶ 6-8 in his original complaint. (Doc. 1, p. 6) Again, those paragraphs are not relevant to the statement at issue. Plaintiff again refers to ¶¶ 10-16 in his original complaint. (Doc. 1, pp. 7) Paragraph (11) actually supports that statement above, *i.e.*, that plaintiff "requested numerous times . . . to be seen by a doctor qualified in the treatment of hepatitis C." However, ¶¶ 10, 12-16 again are not relevant to the statement above at all.

    Plaintiff again refers to Ex. A filed with the original complaint. (Doc. 1, p. 14) Exhibit A actually supports the statement above, *i.e.*, that he asked Dr. Pelmore "numerous times . . . [to be] seen by a[n] infectious disease doctor." As previously noted, however, Ex. A also supports the declarations of Drs. Pelmore and Bridges that Dr. Pelmore ordered an ultrasound of plaintiff's liver.

    Plaintiff again refers to Dr. Pelmore's response to ¶ 1 of plaintiff's first set of interrogatories. (Doc. 141-1, pp. 63-64) Again, Dr. Pelmore's response is not relevant to the statement above.

    Plaintiff's again makes blanket reference to his 109-page memorandum in opposition. (Doc. 141) In the context of the statement above, plaintiff's memorandum in opposition establishes again that plaintiff first saw Dr. Pelmore in March 2012 and that laboratory testing for his hepatitis C was ordered on his behalf more than once.

    Plaintiff refers to Ex. H1-H5, L1-L6, L8-L14 to his memorandum in opposition. (Doc. 141-1, pp. 31-41, 43-51) Exhibits H1-H5 are not

relevant to the statement for reasons previously explained at p. 16. Exhibits L1-L6 are sick call requests that, although they pertain to plaintiff, are not relevant to the statement above. Exhibit L8 is a medical progress report that is not relevant to the statement above. Exhibit L9 is a letter signed by Dr. Berthaud on December 28, 2011, three months prior to plaintiff's incarceration, and Ex. L10-L14 pertain to a prescription for interferon dated February 6, 2012, the affidavit of the Meharry medical records custodian, an article pertaining to liver biopsies, a miscellaneous inmate request form dated February 11, 2013, and an undated request by plaintiff to see the "healthcare contract monitor." None of these exhibits is relevant to the statement above.

3.  **Paragraph 15** of defendants' statement of undisputed material facts reads in relevant part: "Angelina Baker, N.P. . . . evaluated [plaintiff] for complaints of neck and shoulder pain on November 9, 2012. During that visit, Baker discussed [plaintiff's] most recent laboratory data. Also during that visit, [plaintiff] requested a referral to an infectious disease specialist and interferon treatments. Ultimately, a referral was not granted . . . ." (Doc. 116, ¶ 15, p. 5)

    Plaintiff disputes the statement above. (Doc. 143, p. 5) Plaintiff refers to ¶¶ 23-28 in his original complaint. (Doc. 1, pp. 8-9) These paragraphs actually are consistent with the statement above, and with the declarations of Dr. Pelmore and Bridges.

    Plaintiff also refers to Ex. A3 "filed herewith," *i.e.*, with his "reply" to defendants statement of undisputed material facts. Plaintiff filed no exhibits with his "reply" to defendants' statement of undisputed facts, nor can it be liberally construed to what other document he might be referring.

    Plaintiff's again makes blanket reference to his 109-page memorandum in opposition. (Doc. 141) Again, plaintiff's memorandum in opposition actually is consistent with the statement above. (Doc. 141, p. 4)

4.  **Paragraph 17** of defendants' statement of undisputed material facts reads, in relevant part: "[Dr.] Bridges . . . saw [plaintiff] for his hepatitis C and HIV . . . on March 7, 2013, June 6, 2013, and June 25, 2013. During each of these visits, Dr. Bridges reviewed [plaintiff's] laboratory data and determined that [plaintiff] had good control of his hepatitis C disease." (Doc. 116, ¶ 17, p. 5)

Plaintiff disputes the statement above. (Doc. 143, pp. 5-6) Plaintiff asks the court to "see [the] affidavit of Dr. Bridges . . . [and to] . . . see plaintiff's memorandum of law . . . every page." Dr. Bridges' affidavits (Docs. 117-18) are consistent with the statement above, and there nothing in plaintiff's memorandum in opposition that calls into question the correctness of the statement above.

5.  **Paragraph 18** of defendants' statement of undisputed material facts reads, in relevant part: "During [plaintiff's] March 7, 2013, June 6, 2013, and June 25, 2013 presentations to Dr. Bridges, [plaintiff] requested that Dr. Bridges refer him to an infectious disease specialist and prescribe interferon treatments . . . . Dr. Bridges properly determined that [plaintiff] did not require a referral or . . . interferon treatments . . . ." (Doc. 116, p. 6)

    Plaintiff disputes the statement above. (Doc. 143, p. 6) Plaintiff refers the court to Dr. Bridges' affidavits, to "all pages" in his memorandum in opposition, as well as a grievance attached at Ex. A. Again, Dr. Bridges' affidavits (Doc. 117-18) are entirely consistent with the statement above, as is plaintiff's memorandum in opposition. As to the grievance to which plaintiff refers, it is dated in June 2012, fully nine months before plaintiff saw Dr. Bridges and, as such, it irrelevant to Dr. Bridges' interaction with plaintiff. In any event, given that the actions described in the statement above occurred after plaintiff filed his case, they are irrelevant to the instant cause of action.

6.  **Paragraph 19** of defendants' statement of undisputed material facts reads in relevant part: "Throughout his time at [MDCDF], [plaintiff] has had 'good' control of his hepatitis C and abdominal pain and has experienced an improvement with respect to [both]. Indeed, [plaintiff's] most-recent hepatitis C viral load count was not significantly different from [the] . . . the count following a complete course of interferon treatments. Likewise, [plaintiff's] aspartate aminotransferase/alanine aminotransferase . . . values . . . improved over his incarceration . . . ." (Doc. 116, ¶ 19, p. 6)

    Plaintiff disputes the statement above. (Doc. 143, p. 7) Plaintiff invites the court's attention to his "lab results for August 2013 . . . ." (Doc. 143, p. 7) However, plaintiff does not provide those lab results. However, as shown at p. 13, the laboratory results provided by Dr. Bridges in his third affidavit support the statement above for the month of August. Plaintiff does not dispute the representation of Dr. Bridges on this point. Finally, plaintiff refers to pp. 4-12 of his

memorandum in opposition.  Once again, there is nothing in the referenced pages that pertains to the statement above.

7.  **Paragraph 20** of defendants' statement of undisputed material facts reads in relevant part: "Throughout his incarceration at [MDCDF], [Plaintiff] has had regular access to necessary pain medication when he complained of pain, including . . . Ibuprofen through sick call on an as-needed basis . . . Naproxen . . . Tramadol . . . [and] Acetagesic . . . .  In addition, in response to complaints . . . of pain in his abdomen, an ultrasound of [plaintiff's] liver was performed on July 20, 2012 that confirm[ed] that [plaintiff] did not require any additional treatment." (Doc. 116, ¶ 20, p. 7)

Plaintiff disputes the statement above.  (Doc. 143, p. 7)  Plaintiff refers to his grievance filed at Ex. A to his original complaint which supports his disagreement, at least with respect to the alleged events in July 2012.  Exhibit C to plaintiff's original complaint, to which he also refers, has nothing to do with access to medication.  It has to do with referral to a medical specialist.  On the other hand, plaintiff's reference to pp. 1-17 of his memorandum in opposition does support his position.

In addition to his "reply" to defendants' statement of undisputed material facts discussed/analyzed above, plaintiff filed his own statement of undisputed material facts.  (Doc. 144)  However, the document merely raises the following issues before the court in this case: 1) "whether . . . plaintiff had access to adequate pain medication"; 2) "whether . . . plaintiff was denied adequate medical care"; 3) whether "CCA medical policy 13-64 . . . was violated"; 4) "who denied the . . . infectious disease medical referral . . . submitted by . . . Nurse Practitioner Baker" on November 9, 2012; 5) "whether . . . plaintiff suffered a physical injury as the result of denial of medical treatment . . . [that was] more than . . . de-minimis" 6) whether "CCA ha[d] competent health care providers to treat . . . plaintiff's heath care needs"; 7) whether CCA policy 13-70 was violated."  Plaintiff's declaration provides no evidence, law or argument, or anything else of substance in support of his opposition to the motion for summary judgment.

Finally, as previously noted, plaintiff filed a surreply in opposition to defendants' motion for

summary judgment. (Doc. 157) Plaintiff asserts in his surreply that he did not receive two prescriptions for ibuprofen from Dr. Pelmore as Dr. Bridges represented in his third affidavit, addressed above at ¶ 22, p. 13. (Doc. 157, p. 2) Apart from that, plaintiff's surreply again offers nothing new.

Based on the foregoing, the Magistrate Judge accepts as true that plaintiff was not referred to an infectious disease specialist, that he was not prescribed interferon, and that he was not provided with prescription pain medication, at least for the first six months of his incarceration in MDCDF, and that Dr. Pelmore did not prescribe ibuprofen in May and September 2012. The question is whether these "facts" amount to an Eighth Amendment violation.

As previously noted at p. 14, plaintiff received medical care for his condition during the period of time at issue. Specifically, plaintiff was assigned to the MDCDF Chronic Care Clinic upon incarceration, he was examined on a regular basis, laboratory testing was ordered on numerous occasions, the results of those laboratory tests were reviewed with plaintiff when they became available, an ultrasound of plaintiff's liver was ordered at one point during his incarceration in response to his complaint of pain. Based on the foregoing, the Magistrate Judge concludes that defendants provided medical care for his hepatitis C – plaintiff merely disagrees with the treatment he received.

As previously established at p. 9, a prisoner's difference of opinion regarding medical treatment provided does not rise to the level of an Eighth Amendment violation. Because plaintiff received medical care during the period of time in question, and because he merely disagrees with the care provided, this case should be dismissed with prejudice for failure to state a claim on which relief may be granted.

## IV. RECOMMENDATION

For the reasons stated above, the Magistrate Judge **RECOMMENDS**: 1) that defendants' motion for summary judgment (Doc. 114) be **GRANTED**; 2) that this action be **DISMISSED WITH PREJUDICE** for failure to state a claim on which relief may be granted under 28 U.S.C. § 1915(e)(2)(B)(ii); 3) that acceptance and adoption of this R&R constitute the **FINAL JUDGMENT** in this action; and 4) that any appeal **NOT** be certified as taken in good faith pursuant to 28 U.S.C. § 1915(a)(3).

Under Rule 72(b), Fed. R. Civ. P., any party has fourteen (14) days from service of this R&R within which to file with the District Court any written objections to the proposed findings and recommendations made herein. Any party opposing shall have fourteen (14) days from receipt of any objections filed regarding this R&R within which to file a response to said objections. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal of this R&R. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 1111 (1986).

**ENTERED** this the 26th day of May, 2014.

/s/Joe B. Brown
Joe B. Brown
United States Magistrate Judge